IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ROSS D. G.,[1]                          )
                                        )
              Plaintiff,                )
                                        )
vs.                                     )        Case No. 3:20-CV-00274-MAB
                                        )
ANDREW SAUL, COMMISSIONER OF            )
SOCIAL SECURITY,                        )
                                        )
              Defendant.

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.[2]

## Procedural History

Plaintiff protectively filed a Title II application for disability insurance benefits, alleging disability beginning on June 29, 2015 (Tr. 13, 163). Plaintiff's claim was initially denied on April 27, 2016 and then again, upon reconsideration, on March 6, 2017 (Tr. 13). Plaintiff filed a written request for a hearing on May 2, 2017, and a hearing was held on November 20, 2018. Plaintiff was represented by counsel at this hearing (Tr. 13). After

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (*See* Doc. 10).

holding the evidentiary hearing, ALJ Jason Panek denied the application on February 21, 2019 (Tr. 27). The Appeals Council denied review, and the decision of the ALJ became the final agency decision (Tr. 1-6). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### Issues Raised by Plaintiff

Plaintiff raises the following issue:

1.   The ALJ failed to sufficiently examine the medical records in formulating Plaintiff's residual functional capacity and then did not properly consider Step 5 of his analysis, as the residual functional capacity does not match the jobs found to be appropriate for Plaintiff by the ALJ and VE.

### Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have

---

[3]  The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the DIB regulations out of convenience.

a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v.*

*Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that Plaintiff had not worked at the level of substantial gainful activity since the alleged onset date of June 29, 2015 (Tr. 15).

The ALJ found that, beginning on the alleged onset date, Plaintiff had severe impairments of residuals of a cerebrovascular accident (CVA), coronary artery disease, obesity, neurocognitive disorder, major depressive disorder, and generalized anxiety disorder, which did not meet or equal a listed impairment outlined in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §404.1520(d), §404.1525, and §404.1526) (Tr. 15).

The ALJ found that Plaintiff had non-severe impairments as well, including a fractured skull/head trauma in addition to a brain tumor that occurred in August 2008, prior to Plaintiff's alleged disability onset date (Tr. 15-16). Plaintiff also has restless leg syndrome; however, the ALJ determined that this was a non-severe condition, as no treating source determined that this condition caused functional limitations (Tr. 16). Similarly, while Plaintiff described experiencing migraines, no treating source determined that they caused Plaintiff functional limitations, so the ALJ determined these migraines to be non-severe The ALJ determined the following conditions were also non-severe, as no treating sources determined that they caused Plaintiff functional limitations: left cubital tunnel syndrome, carpal tunnel syndrome, De Quervain tenosynovitis,

hypertension, stage III kidney disease, and vision and speaking difficulties (Tr. 17).

At step four, the ALJ found that Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. §404.1520(d). The ALJ considered Plaintiff's obesity, both singly and in combination with his other impairments, in determining whether he had medically determinable severe impairments, as required by SSR 02-1p (Tr. 17). The ALJ determined that the record did not support finding that Plaintiff's obesity met the listing criteria (Tr. 18). The ALJ found similarly for Plaintiff's mental impairments as well (Tr. 18).

The ALJ found that Plaintiff had the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR §404.1567(a) with the following limitations:

> No climbing of ladders, ropes, or scaffolds; no more than occasional climbing of ramps or stairs, balancing stooping, kneeling, crouching, or crawling; and must avoid all exposure to hazards, unprotected heights, and dangerous moving machinery. Plaintiff can understand and remember simple instructions, can attend to and carry out routine and repetitive tasks, but not at a production rate pace (such as that involved in assembly line work). Finally, Plaintiff can occasionally interact wit the public and coworkers.

(Tr. 19).

Based on the testimony of a vocational expert ("VE") and the Dictionary of Occupational Titles (DOT), the ALJ found that plaintiff was unable to perform his past work, including that of forklift operator (DOT 921.683-050; medium exertion level with an SVP of 3), cook (DOT 313.374-010; medium exertion level with an SVP of 5), and welder (DOT 810.384-014; heavy exertional level with an SVP of 5) (Tr. 26). Also based on the VE's testimony, the ALJ determined that Plaintiff was not disabled because there are

jobs that exist in significant numbers in the national economy that the claimant can perform (Tr. 26). Specifically, the vocational expert determined that Plaintiff could perform the requirements of a hand packer position; a production worker; and an inspector tester sorter position (Tr. 27).

<u>**The Evidentiary Record**</u>

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points and factual allegations raised by Plaintiff and not, necessarily, reflective of the entire record, as Plaintiff has numerous ailments, many of which are not at issue in the present matter.

**1.      Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing in November 2018. A vocational expert ("VE") listened to his testimony (Tr . 35; 54).

At the time of the hearing, Plaintiff was 48-years old and lived with his girlfriend in a house in East Alton, Illinois (Tr. 39). Plaintiff graduated from high school and completed 40 out of 60 weeks of vocational training after high school back in 1999 (Tr. 40). Plaintiff testified that he had not driven a car for approximately eight months prior to the hearing (Tr. 39-40). He stopped driving because he would be "all over the road" and scared his girlfriend (Tr. 40). Plaintiff testified that he received food stamps as assistance since he was not working (Tr. 41). Plaintiff has two children with his ex-wife who visit Plaintiff, as they live full-time with his ex-wife (Tr. 42).

Plaintiff testified that he stopped working in June 2015 as a forklift operator (Tr.

40). He ultimately left the job because he got into an accident and was afraid of causing further accidents (hurting himself or others) due to his low blood pressure (Tr. 41). Plaintiff further explained that at the time, he was taking five blood pressure medications, but has since resolved any issues with his blood pressure (Tr. 41). He testified that he lost consciousness once due to a dip in blood pressure and had to spend three days in the hospital (Tr. 41).

The ALJ questioned Plaintiff further about his prior work. Plaintiff explained that as a forklift driver, he would wrap grain and take pallets to trucks for shipping (Tr. 42-43). At that time, Plaintiff was lifting up to 50 lb. boxes (Tr. 43). Prior to being a forklift driver, Plaintiff worked as a cook at a restaurant and was required to empty fryer grease twice a week that weighed approximately 50 lbs. (Tr. 43). And prior to his time as a cook, Plaintiff was a playground builder, which required welding (Tr. 44). Plaintiff described that he was on his feet for twelve hours a day with that job and had to lift 100 lb. jigs with the help of another worker (Tr. 44).

Plaintiff testified that the main ailment that has prevented him from working since June 2015 is his migraines (Tr. 44-45). Plaintiff explained that Dr. Sherwood treats him for migraines currently, although he previously saw Dr. Lieu (who gave Plaintiff Botox injections to treat his migraines) (Tr. 45). Plaintiff testified that he last received Botox injections for his migraines about a year before the hearing in September 2017 (Tr. 45). The Botox injections reduced the frequency of Plaintiff's migraines, but did not eliminate them completely (Tr. 45-46). Prior to getting Botox, Plaintiff testified he was having approximately 6-7 migraines per week with intense pain (Tr. 46). Plaintiff described that

when he has migraines, the pain is "so intense that [he] almost get[s] sick" and they last for two to three hours (Tr. 46). At the time of the hearing, despite not having had Botox injections in over a year, Plaintiff testified that he had migraines three to four times a week. Prior to Botox, Plaintiff also tried taking medications, including methocarbamol, but nothing really helped (Tr. 46).

Plaintiff also testified that he was still struggling due to the stroke he had in 2014. He explained that he experiences numbness above his left knee to his toes and then from his elbow to his fingertips as if the extremities were asleep (Tr. 47). Because of the numbness and lack of sensation, Plaintiff explained he has trouble holding things in his left hand. For example, if he is smoking a cigar, it will sometimes just fall to the floor out of his hand (Tr. 47). Plaintiff testified that he needs help buttoning buttons. Prior to the hearing, Plaintiff explained that he asked his girlfriend to help button his pants because he did not have the strength to do it, but this is not something he has to ask her to do daily (Tr. 48). The ALJ questioned Plaintiff, stating that some of the medical records indicate that the numbness and weakness in his hands and arms has gotten better over time, but Plaintiff countered, stating that he never told his doctors that this issue improved (Tr. 48).   Plaintiff walks with a cane, and explained that he had been using one for over a year prior to the hearing, as prescribed by one of his doctors (Tr. 49). He uses the cane for his dizzy spells to help catch him from falling, as his equilibrium was impacted by the stroke (Tr. 49).

Plaintiff's attorney also questioned him, asking him to describe how his report of chest pains impacted him. Plaintiff explained that he has chest pains that are "so bad"

that he has to lay down (Tr. 49-50). He takes a nitroglycerin pill once a month for the pain (Tr. 50). He testified he has these intense chest pains every day and even walking to the bathroom makes it difficult for him to breathe (Tr. 50). Basically, any time Plaintiff gets up from a reclining position to do anything, he experiences shortness of breath and chest pains (Tr. 50). While he testified that he was taking pain medication for these issues, they were not effective in treating the pain, although he does get some relief from the nitroglycerin pills (Tr. 50).

Plaintiff also testified that he has residual cognitive issues from the stroke. He has trouble remembering things and understanding what people say (Tr. 50-51). Plaintiff further explained that approximately two to three days a week, his girlfriend has to explain something over and over again to him because he cannot understand what she originally said (Tr. 51). A typical day in Plaintiff's life starts with Plaintiff limping to the living room from his bed, where he sits or lays down because he doesn't feel well (Tr. 51). If he is having a migraine, he sits in the dark and/or watches television with the volume down (Tr. 51). He does not do any chores around the house or shop for groceries (Tr. 51).

After Plaintiff's testimony, the ALJ questioned the VE, asking him first to identify any inconsistencies with his testimony and the information contained in the Dictionary of Occupational Titles as he testifies, to which the VE agreed (Tr. 52). The VE explained that Plaintiff's prior work of a forklift driver (DOT 921.683-050) had a medium exertional

level and was a semi-skilled job, with an SVP of 3[4]  (Tr. 53). Plaintiff's job as a cook (DOT

313.374-010) also had a medium exertional level and was a skilled job, with an SVP of 5.

As a welder (DOT 811.684-014), Plaintiff had a heavy exertional level and an SVP of 5

since it was a skilled job (Tr. 52-53). The ALJ then asked the VE the hypothetical question,

assessing "a younger individual" with at least a high school education and work

consistent with Plaintiff's history. This hypothetical person would be limited to a light

range of work (including no climbing ladders, ropes, or scaffolds, for example) and

would need to avoid all exposure to hazards, among other things (Tr. 54). The VE testified

that this person could not perform Plaintiff's prior work, as his prior work was all above

a medium exertional level, ranges from semi-skilled to skilled, and all had exposures of

hazards (Tr. 54). But, the VE testified that there are some jobs that this person could do in

the national economy, such as a light unskilled cleaner position (Tr. 54). The ALJ then

limited the hypothecial person to sedentary tasks and explained that this person would

be required to use a cane when ambulating, and asked the VE to explain if there were any

jobs for this hypothetical person. The VE explained there are some sedentary unskilled

positions, like that of an unskilled inspector tester sorter, which have approximately

12,000 positions nationally (Tr. 55).

　　　Plaintiff's attorney then questioned the VE, asking if there would be any effect on

the job if this hypothetical person needed to be redirected six times per day (Tr. 56).

---

[4]  A job with an SVP level of 1-2 are unskilled while those rated 3-4 are semiskilled. Anything rated a 5 or
higher is considered skilled. *See here* DI 25001.001 Medical and Vocational Quick Reference Guide,
https://secure.ssa.gov/poms.nsf/lnx/0425001001 (last accessed September 22, 2021).

Plaintiff's counsel also asked whether an individual who needed to be redirected six times per day or is off-task 15% or more of the day due to their impairments would be able to perform the jobs previously outlined as appropriate by the VE (Tr. 56). The VE responded that this behavior might be appropriate during the training or probation period, but could result in termination after that (Tr. 56). Similarly, Plaintiff's counsel asked whether an individual who had to miss more than one day per month could maintain the employment outlined by the VE, and the VE admitted it would result in termination if the individual had to miss more than one or two days in a given month (Tr. 56). The VE explained that the job numbers he cited in his testimony came from the Occupational Employment Quarterly as well (Tr. 57).

### 2.    Relevant Medical Records

Plaintiff submitted medical records to aid the ALJ in his decision. After Plaintiff's stroke, on August 28, 2015, Plaintiff had an EMG and nerve conduction study done, which resulted in abnormal results (Tr. 548). The test showed that Plaintiff had moderate left median sensory entrapment neuropathy at the flexor retinaculum, also known as carpal tunnel[5] (Tr. 548).

On January 28, 2016, Plaintiff underwent a surgery to attempt to help his symptoms related to carpal tunnel. The surgery involved a left cubital tunnel release at the elbow; De Quervain release at the wrist; release of the first dorsal compartment hood;

---

[5] MAYO CLINIC, *Carpal Tunnel Syndrome,* available at https://www.mayoclinic.org/diseases-conditions/carpal-tunnel-syndrome/symptoms-causes/syc-20355603 (last visited September 24, 2021).

and left open carpal tunnel release[6] (Tr. 398-400). Although this surgery was intended to relieve some of Plaintiff's symptoms, the medical records indicate that he continued to have numbness in his left hand and arm.

On February 29, 2016, Plaintiff went to see his treating neurologist, Dr. Michael Liu, M.D., who diagnosed Plaintiff with paresthesia[7] and prescribed him gabapentin (Tr. 418-419). In these records, Plaintiff reported that the carpal tunnel syndrome release surgery helped the tingling in his hand, but not the arm and lower extremity (Tr. 419).

Plaintiff returned to Dr. Liu on May 2, 2017 to be assessed for paresthesia of skin (Tr. 667). In these medical records, Dr. Liu confirms that he reviewed Plaintiff's MRI (dated April 8, 2014), which revealed that Plaintiff had two small acute strokes over the right thalamus (Tr. 667). Plaintiff was still on gabapentin at this time, and reported having chronic migraines (5-6 times a week) (Tr. 667-668). Dr. Liu recorded that he last saw Plaintiff on May 31, 2016, so approximately one year prior, as Plaintiff "did not show up for follow-up" (Tr. 668). The notes also indicate that Plaintiff still has tingling numbness over the bilateral upper extremities from the elbow down to his hands, as well as in both lower extremities from both feet up to distal legs (Tr. 668). Plaintiff reported that the January 2016 surgery "did not help" (Tr. 668).

---

[6] This surgery appears to have involved a series of tendon releases to alleviate pressure, numbness, and pain. *See* MAYO CLINIC, *De Quervain's tenosynovitis: Diagnosis and Treatment*, available at https://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/diagnosis-treatment/drc-20371337 (last visited September 24, 2021).

[7] Paresthesia is a crawling, numbness, tingling, or itching sensation on a person's skin. *See* HEALTHLINE, *What is Paresthesia?*, available at https://www.healthline.com/health/paresthesia (last visited on September 24, 2021.

Plaintiff was seen on June 13, 2017 by his primary care physician, Dr. Sambasivam Suthan, M.D., ("Dr. Sam"), for complaints of feeling lightheaded (Tr. 633-635). Dr. Sam recorded that Plaintiff has a history of cerebrovascular accident from April 2014 and detailed that some left hemiparesis mild residual effects are still present (Tr. 636). Plaintiff requested a cane, which Dr. Sam prescribed to support Plaintiff's gait (Tr. 636).

Plaintiff was seen again by Dr. Sam on August 14, 2017, December 14, 2017, April 5, 2018, and July 19, 2018 (Tr. 631, 626, 621, 617). At these appointments, Dr. Sam detailed that Plaintiff had some weakness on the left side of his body. On September 22, 2017, while seeing Dr. Liu, Plaintiff reported that he had continued tingling numbness in both hands and feet (Tr. 677).

### 3. State Agency Consultants' Opinions

On April 14, 2016, Dr. Raymond Leung, M.D., performed a consultative evaluation ("CE") at the request and expense of Defendant. Dr. Leung recorded that Plaintiff has a history of stroke, brain tumor, and currently has a lack of sensation in his left foot and left arm (Tr. 407). At the time, Plaintiff did not use a cane and reported being right handed (Tr. 407). Dr. Leung observed Plaintiff and reported that his left pinch, grip, arm, and leg strength was at a 4+ out of 5; however, Plaintiff did have decreased sensation to light touch in the left third through fifth fingers (Tr. 409). Plaintiff was able to pick up a penny from the table with both hands fairly well (Tr. 408). Additionally, Dr. Leung reported Plaintiff could "manipulate a small object with his hands fairly well" (Tr. 409).

### Analysis

In this appeal, Plaintiff advances two central arguments in support of his

contention that remand is appropriate, both of which are related to Plaintiff's Residual Functional Capacity ("RFC"). First, Plaintiff argues that the ALJ failed to sufficiently engage with the medical records in determining that Plaintiff could engage in the jobs of nut sorter, ampoule sealer, and compact sealer, as Plaintiff's medical records clearly indicate issues with mobility, particularly on his left side, that preclude him from being able to do these jobs (Doc. 21, p. 6). Second, Plaintiff argues that these three job descriptions, on their face, do not meet the requirements of Plaintiff's RFC assessment (*Id.* at p. 3).

The RFC is a measure of what an individual can do despite her limitations. *Young v. Barnhart*, 362 F.3d 995, 1000–01 (7th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing' basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

While Plaintiff has a number of severe impairments (*e.g.,* residuals of cerebrovascular accident, coronary artery disease, obesity, neurocognitive disorder, major depressive disorder, and generalized anxiety disorder) and Plaintiff himself identified migraines as his biggest impediment to working during the hearing (Tr. 44-45),

Plaintiff's arguments at this stage rest on issues with his mobility on his left side resulting from his stroke, which occurred in 2014. As such, the Court will solely focus its examination on this issue.

First, Plaintiff argues remand is appropriate because the ALJ did not engage sufficiently with the medical records to find that Plaintiff has more limited strength and mobility as a result of his stroke. Because of this, Plaintiff argues the ALJ improperly constructed his RFC and incorrectly determined that he could do the jobs of nut sorter, ampoule sealer, and compact assembler. Plaintiff points to portions of the medical records he argues show his limitations with mobility and sensation on his left side. Plaintiff argues these limitations preclude him from being able to do any of these three jobs because they require grip strength and dexterity that Plaintiff does not possess.

As an initial matter, the three jobs determined by the ALJ and VE as appropriate for Plaintiff during the hearing are as follows:

1. Hand piper or ampoule sealer (DOT 559.687-014)—seals ampoules filled with liquid drug products, preparatory to packaging: Rotates neck of ampoule in flame of Bunsen burner to melt glass. Grips tip of ampoule, using tweezers, and draws tip away from neck to seal ampoule as glass hardens. Places sealed ampoule in basket for sterilization and inspection. May hold unsealed ampoule against jet of inert gas to displace air. May immerse sealed ampoules in dye bath to test for leaks. May tend machines that steam-wash and fill ampoules.

2. Nut sorter, inspector, or tester (DOT 521.687-086)—removes defective nuts and foreign matter from bulk nut meats: Observes nut meats on conveyor belt, and picks out broken, shriveled, or wormy nuts and foreign matter, such as leaves and rocks. Places defective nuts and foreign matter into containers. May be designated according to kind of nut meat sorted as Almond sorter (can. & preserv.); Peanut Sorter (can. & preserv.).

3. Production worker or compact assembler (DOT 739.687-066)—Joins upper

and lower halves of vanity compacts: Inserts pins in hinges to join halves, using fingers or tweezers. Attaches spring catch lock by pressing it into place with pinching tool. Fits mirror on inside of cover.

Plaintiff contends these three jobs require "far more precision, concentration, and pinch strength than Plaintiff is reasonably capable of performing" (Doc. 21, p. 5). As support, Plaintiff cites to portions of the medical record, in which his neurologist and primary care physician recorded that Plaintiff still experienced numbness and tingling in his left hand and arm after his January 28, 2016 surgery for carpal tunnel syndrome. *See., e.g.,* Tr. 548, 398, 420, 408. Plaintiff is correct that medical professionals indicated that he still possessed some weakness on the left side of his body (Doc. 21, p. 7, citing to Tr. 631, 626, 621, and 617). Plaintiff argues that the ALJ improperly relied on a consultative examiner, Dr. Leung, and his report finding that Plaintiff was able to manipulate small objects with his hands "fairly well," which Plaintiff argues is inconsistent with the record overall (Tr. 409).

While at first blush, the ALJ determined that "no treating source opined that the claimant has functional limitations with fine motor at the left upper left extremity," he then expounded on and supported this statement, spending three, single-spaced paragraphs discussing the medical records and lack of support for Plaintiff's contention that he significantly struggles with mobility on his left side (Tr. 17, 21-22). For example, the ALJ points to records of Plaintiff's primary care physician and neurology exams that indicate Plaintiff, despite experiencing numbness, retains strength and mobility in both his right and left hands both before and after his January 28, 2016 surgery.

More specifically, the ALJ summarized Plaintiff's August 11, 2015 visit to his

primary care physician, Dr. Sam, during which Plaintiff denied dropping things despite experiencing some numbness (Tr. 311). The ALJ further summarized this medical note in his decision, relying on Dr. Sam's report that Plaintiff's motor strength and tone were "normal" (Tr. 314). The ALJ cited to Plaintiff's neurology examinations in May 2016 and May 2017, which indicated that Plaintiff had 5 out of 5 motor strength and normal sensation (Tr. 420, 619). The ALJ also cited to records indicating that Plaintiff's neurologist reported that he had residual left-sided weakness from a stroke, but "no gross sensory or motor deficits noted at this time" in November 2014 (Tr. 340-341). The Court notes that this medical record does indicate, however, that Plaintiff had decreased motor strength on the left side (Tr. 340-341). The ALJ also points to a note from a May 31, 2016 visit to Dr. Sam, in which he recorded that Plaintiff is still experiencing tingling and numbness of the left side, but there are no abnormal movements or tenderness (Tr. 414-416). Similarly, the ALJ points to another Dr. Sam record from May 2, 2017 in which Dr. Sam records that Plaintiff is still experiencing left side numbness, but that his bulk motor skills are normal, with normal tone, and his strength is 5/5 with no abnormal movement (Tr. 668-669). Contrary to what Plaintiff argues, the ALJ determined that the consultative examiner's findings that Plaintiff has a slight reduction in strength and sensation was *not* represented in his medical records and was, therefore, inaccurate (Tr. 21; 409). If the ALJ's findings were conclusory and failed to address the record as a whole, remand would be proper. *Pamela K.S. v. Comm'r of Soc. Sec.*, No. 19-cv-1112-RJD, 2020 WL 4040908, at *10 (S.D.Ill. July 17, 2020) (citing *Moore,* 743 F.3d at 1121-22). But that is not the case here. In fact, the ALJ went through a significant portion of the medical records, summarizing

them in his report, to find that overall, they indicate that Plaintiff has not lost as much strength and dexterity as Plaintiff described during his testimony.

Plaintiff's first argument is little more than an invitation for this Court to reweigh the evidence. He has not identified any error requiring remand. Even if reasonable minds could differ as to whether Plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester,* 920 F.3d at 510; *Shideler v. Astrue,* 688 F.3d 306, 310 (7th Cir. 2012). The ALJ examined both Plaintiff's own medical provider's notes, as well as the notes from the consultative examination, and assessed how they were consistent with and supported by the record overall. An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue,* 580 F.3d 471, 475 (7th Cir. 2009) (internal citations omitted). The ALJ did that here in determining that while Plaintiff may experience numbness, the record as a whole indicates he has retained strength in his left side.

While Plaintiff's first argument was unsuccessful, his second argument gains a bit more traction. Plaintiff argues that because the ALJ determined in his RFC that he must "avoid all exposure to hazards, unprotected heights, and dangerous moving machinery," the three jobs outlined for Plaintiff by the ALJ and VE are inappropriate on their face and support remand. For example, as a nut sorter, Plaintiff would have to "observe[] nut meats on a conveyor belt, and pick[] out broken, shriveled, wormy nuts" (Doc. 21, p. 4).

Plaintiff argues that working around a conveyer belt means he cannot avoid "dangerous moving machinery," as outlined by his RFC. Defendant disagrees, and argues that Plaintiff simply failed to read the entire description of the jobs, because if he had, he would see that the descriptions themselves state he will not be exposed to machinery. Additionally, Defendant argues that Plaintiff failed to challenge the VE's testimony at the time of the hearing, and, therefore, cannot advance that argument now. The Court agrees with Plaintiff and this case will be remanded.

At step five of the sequential evaluation process for determining disability, the Commissioner must establish "that the claimant can perform other work that exists in significant numbers in the national economy." *Overman v. Astrue,* 546 F.3d 456, 464 (7th Cir. 2008 (internal quotations omitted). As part of this inquiry, the ALJ must comply with SSR 00-4p,[8] which clarifies the standards for using evidence from VEs in disability proceedings. *See Prochaska v. Barnhart*, 454 F.3d 731, 735–36 (7th Cir. 2006) (discussing an ALJ's duties under SSR 00-4p as part of the step-five inquiry); SSR 00-4p, at *1–2. Under SSR 00-4p, an ALJ must affirmatively (1) ask if a VE's evidence "conflicts with information provided in the DOT" before using that evidence to find a claimant not disabled; and (2) "investigate and resolve any apparent conflict between the VE's testimony and the DOT" by obtaining "reasonable explanations for the conflict." *Overman*, 546 F.3d at 462–63 (internal quotations omitted); *Weatherbee v. Astrue*,

---

[8]  *See* SSA POLICY INTERPRETATION RULING, available at
https://www.ssa.gov/OP_Home/rulings/di/02/SSR2000-04-di-02.html (last accessed September 24, 2021).

649 F.3d 565, 570 (7th Cir. 2011). These affirmative obligations apply regardless of whether a claimant identifies the alleged conflict at the hearing. *See Overman*, 546 F.3d at 463 (a claimant does not forfeit an SSR 00-4p argument by failing to raise it at the administrative level).

Defendant is correct that in his cited description of ampoule sealer, nut sorter, and compact assembler, the jobs list (after the main descriptions) that "moving mech. parts: not present—activity or condition does not exist."[9] SSR 00-4p only requires the ALJ to obtain explanations for apparent conflicts, i.e., those conflicts that are "so obvious that the ALJ should have picked up on [them] without any assistance." *Mitchell v. Berryhill*, No. 17 C 6241, 2019 WL 426149, at *6 (N.D. Ill. Feb. 4, 2019) (internal citations omitted). Plaintiff was represented by counsel and he is presumed to have put forth her best case for benefits at the hearing. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007). Plaintiff's counsel did not object to the VE's testimony or point out that these three job descriptions were inconsistent with Plaintiff's RFC.[10] Additionally, the ALJ explicitly asked the VE to

---

[9] *See* DOT 559.687-014: Ampoule Sealer, 1991 WL 683782 (4th Ed. 1991); DOT 521.687-086: Nut Sorter, 1991 WL 674226 (4th Ed. 1991); and DOT 739.687-066: Compact Sealer, 1991 WL 680189 (4th Ed. 1991). These jobs descriptions do not include the "moving mech. parts: not present" language on the Department of Labor's website. *See* OALJ LAW LIBRARY, DOT, Processing Occupations 558.485-010 to 570.683-010, available at https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOT05F (last accessed September 27, 2021); OALJ LAW LIBRARY, DOT, Processing Occupations 519.585-018 to 522.685-094, available at https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOT05B (last accessed September 27, 2021); OALJ LAW LIBRARY, DOT Benchwork Occupations 737.381-010 to 761.684-101, available at https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOT07D (last accessed September 27, 2021).

[10] Plaintiff is represented by a different attorney in this Court.

identify portions of his testimony and findings that were inconsistent with the DOT, and the VE testified that his testimony was consistent (Tr. 52).[11]

Because Plaintiff did not object at the hearing, he "now has to argue that the conflicts were obvious enough that the ALJ should have picked up on them without any assistance, for SSR-00-4p requires only that the ALJ investigate and resolve *apparent* conflicts between the VE's evidence and the DOT." *Overman v. Astrue,* 546 F.3d 456, 463 (7th Cir. 2008) (citing *Prochaska v. Barnhart,* 454 F.3d 731, 735 (7th Cir. 2006))(emphasis in original). Here, the error is so apparent that the ALJ should have picked up on the discrepancy without assistance.

The ALJ determined the RFC, including the provision that Plaintiff must avoid all hazards, unprotected heights, and dangerous moving machinery. Additionally, the ALJ determined that Plaintiff cannot perform at a production rate pace "such as that involved in assembly line work" (Tr. 19). The description of nut sorter includes that Plaintiff would be working on a conveyer belt. Since the RFC explicitly states that Plaintiff must avoid "dangerous moving machinery," the Court cannot say that a conveyer belt is not dangerous moving machinery, as there is nothing in the record to indicate that it isn't. Similarly, the ALJ determined Plaintiff could work with flames in a Bunsen burner to

---

[11] An ALJ may rely on even "purely conclusional" VE testimony that goes unchallenged. *Barrett v. Barnhart,* 355 F.3d 1065, 1067 (7th Cir.), on reh'g. 368 F.3d 691 (7th Cir. 2004). *See also Liskowitz v. Astrue,* 559 F.3d 736, 744 (7th Cir. 2009) ("Had [plaintiff] actually objected to the VE's testimony, the VE could have said more…As it stands, however, the VEs testimony was both unobjected to and uncontradicted. Thus, the ALJ was entitled to credit this testimony."); *Donahue v. Barnhart,* 279 F.3d 441, 446-47 (7th Cir. 2002) ("When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion.").

melt glass despite including in his RFC that Plaintiff must avoid "all exposures to hazards." These job descriptions appear to contradict Plaintiff's RFC and account for 34,000 out of the 59,000 jobs determined to be appropriate based on Plaintiff's skill level (Tr. 27). As such, remand is proper to resolve the discrepancies between Plaintiff's RFC and the ALJ's selected jobs. *See White v. Colvin,* No. 1:13-cv-00914-JMS-TAB, 2014 WL 301487 (S.D. Ind. Jan. 28, 2014) (holding that remand was proper when a Plaintiff's RFC included avoiding "concentrated exposure to hazards such as…dangerous moving machinery" and the ALJ and VE determined the Plaintiff could do the jobs of packager and dishwasher as they exposed him to and required him to use machines).

In sum, while the ALJ certainly did complete a deep dive into the medical records to determine Plaintiff's RFC, the ALJ failed to properly resolve discrepancies between Plaintiff's RFC and the three jobs identified as appropriate for him by the VE. An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal citations omitted). Here, the ALJ failed to build the requisite logical bridge between Plaintiff's prospective jobs in the national market and his RFC.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Plaintiff was disabled during the relevant period or that he should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:** September 27, 2021

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**